IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| ANTHONY THOMPSON, ) | Case No. 4:22cv10 | |
| Complainant, ) | | |
| ) | | |
| v. ) | Agency No. DON _____ | |
| ) | | |
| THE HON. THOMAS HARKER ) | | |
| Acting Secretary, ) | | |
| U.S. Department of the Navy, ) | | |
| Agency. ) | | |
| ) | Date: January 26, 2022 | |

### PRO SE CIVIL RIGHTS COMPLAINT

COMES NOW the Complainant, Anthony Thompson.



**PARTIES:**

**Plaintiff:**

Anthony Thompson, an employee of Military Sealift Command

**Defendant(s):**

- Frank Wells, an employee of Military Sealift Command

- Robert Sylvester, an employee of Military Sealift Command

- Leonard Bell, an employee of Military Sealift Command

- Andy Busk, an employee of Military Sealift Command

### I.  INTRODUCTION

1. This is a civil action brought under the Constitution of the United States, and the Constitution and laws of the Commonwealth of Virginia, seeking damages and such other related

relief as the Court deems just and proper, for violation of Title violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (2) disparate treatment on the basis of race in violation of Title VII.

2. For the last three (3) years, the Complainant, Mr. Thompson has been forced to endure a consistently hostile work environment due to his race, African American. The Complainant, Anthony Thompson ("Mr. Thompson" or "Complainant"), asserts the following claims against the United States Department of the Navy ("Navy" or "Agency"):

    a. Bullying and intimidation to Complainant from co-workers.

    b. Threats to Complainant of termination of employment.

    c. Threat of harassment towards Complainant and his wife.

    d. Pressure on Complainant to violate U.S. Title 10 Law.

    e. Retaliation against Complainant for refusing to violate U.S. Title 10 Law.

    f. Disparate treatment in comparison to similarly situated white employees.

    g. Revoking of the Complainant privileges offered to management personnel.

    h. Unprofessional public screams and insults at Complainant.

    i. Failure of the Agency to protect the civil rights of Complainant.

    j. Loss of career promotional opportunities for Complainant.

    k. Long term health impacts on Complainant due to increased stress and fear.

## II.    JURISTICTION AND VENUE

3. This court has jurisdiction over the subject matter and parties, as this case involves questions of federal law, and because Plaintiff seeks damages for violation of his civil rights.

## III. NATURE OF THIS ACTION

4. This is a civil action brought pursuant to Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

5. The original complaint was initially processed through the Military Sealift Command's EEO office (Case No. 20-32205-01731) and the U.S. Equal Employment Opportunity Commission, Charlotte District Office (EEOC No. 430-2021-00318X)

    a. EEOC Final Order Date: October 28, 2021

## IV. STATEMENT OF FACTS

6. Mr. Thompson is a retired Naval Officer and disabled veteran of the United States Navy and served honorably for twenty-four (24) years. He began his employment with the Military Sealift Command ("MSC") in August 2011 as a Port Engineer/Marine Surveyor. He began his duty as a Port Engineer for the MSC Ship USNS SACAGAWEA (T-AKE 2) in 2011.

7. As recognized by his superiors, Mr. Thompson has been a top performer during his tenure of more than a decade of managing the SACAGAWEA. Numerous MSC ship's Captains, Chief Engineers, Program Managers have awarded him accolades, and he has been referred to as hard working, intelligent, and very easy to work with. Mr. Thompson has never experienced any difficulty in working with other coworkers.

8. In January 2018, Mr. Frank Wells began as Chief Engineer for SACAGAWEA. During their first meeting, Mr. Wells asked Mr. Thompson to replace the ship's rescue boat davits.

Mr. Thompson advised Mr. Wells of the process for performing such work, and that it could not be completed without special approval due to U.S. Law Title 10 ("Title 10") which prohibits performing certain projects in a foreign country unless emergent circumstances exist.

9. Mr. Wells continuously requested and encouraged Mr. Thompson to replace the rescue boat davits in violation of Title 10. His anger grew when Mr. Thompson refused to break the law to comply with his request. In April and May of 2018, Mr. Wells continued to instruct Mr. Thompson to break the law.

10. On September 11, 2018, Mr. Thompson contacted the T-AKE Class Manager Mr. Leonard Bell and the T-AKE Engineering Type Desk, Mr. John Massey to request a discussion on maintenance matters on SACAGAWEA. During the meeting, Mr. Thompson reported that Mr. Wells was exposing him to a hostile work environment and continually pressured him to violate U.S. Title 10 Law. At the conclusion of the meeting, Mr. Bell promised to get more engaged with the Ship's Management Team issues. Despite his complaint regarding the abusive treatment from Mr. Wells, neither Mr. Bell nor Mr. Massey informed Mr. Thompson that he would need to contact an EEO counselor to file an official complaint.

11. On October 10, 2018, Mr. Thompson was sitting at a table having lunch with other shipmates on the flight deck of SACAGAWEA. Mr. Wells approached and asked Mr. Thompson about the status of a specific project. Mr. Thompson replied that they could discuss the issue later in private or the next day. Mr. Wells replied that Mr. Thompson might not be alive or onboard to discuss it tomorrow. Mr. Thompson replied politely to try to deescalate the situation, but Mr. Wells then burst out "I need you to fucking do your job!!". Mr. Thompson tried to defend himself and asked what he did to deserve this kind of treatment. Id. Mr. Wells continued by degrading Mr. Thompson, calling him a worthless piece of shit, the worst Port Engineer he ever knew, "sorry

4

fucking Tony Baloney," and other derogatory names. He concluded the outburst by stating that he was going to call his "friends in high places" and have Mr. Thompson fired.

12. Over the course of Mr. Thompson's employment, Mr. Wells regularly threatened to call his "friends in high places" and have Mr. Thompson terminated if he did not comply with Mr. Wells' requests, regardless of whether the requested action was illegal.

13. Moreover, Mr. Wells regularly referred to Mr. Thompson as "sorry ass Mr. Tony Baloney," an "idiot," asserted that he did not know anything and could not do his job well, and laughed when he made these comments about Mr. Thompson. Mr. Wells also referred to Mr. Thompson in veiled way by using terms such as "people like him," "those kind," and "them" referring to African Americans.

14. On December 15, 2018, Mr. Thompson informed Mr. Wells that the requested upgrade installation of a new TV satellite antenna was a Trans-Alt ("T-Alt") and was included in the next repair package. He also informed him that a Korean contractor could not complete the contract because it would violate Title 10.

15. Mr. Wells was apparently angry that Mr. Thompson would not comply with his demand and violate applicable regulations in the process, and responded in an email stating "I expect you to get it fixed. You have sat on, delayed and used every excuse in the book not to this dome [sic] and quite frankly I am tired of it." "I am going to give [the crew] you [sic] home phone so they can call you and your wife and you can explain to them why it still isn't done." Also copied on the email were Captain Robert Sylvester, John Massey, Leonard Bell, Thong Nguyen, David Bowyer, and Paul Barkdoll. Mr. Thompson was immediately shocked and distraught when he read the email threatening himself and his wife with harassment by the crew.

16. Later that day, Mr. Bell responded to Mr. Wells expressing his displeasure with Mr.

Wells' shocking conduct stating "I am not happy with the tone of your email. I think it is unacceptable for a senior CIVMAR leader to dress down one third of this ship's SMT especially with wide distro." "Whether you like it or not, Tony is your PPE. HE WILL REMAIN YOUR PPE." "You are going to have to find a way to work with him in a civil manner.

17. Mr. Thompson responded to Mr. Bell on January 6, 2019 thanking him and noting that "This is the first time in the almost eight (8) years that I have been working at MSC as the Port Engineer for SACAGAWEA that this magnitude of threats and harassment appears to be on the verge of being at my doorstep at home. I have pretty thick skin and do not scare easy, however I must say that although I certainly do not appreciate these types of tones and threats from anyone, I hate to say it but I may have become acclimated, or maybe sensitized to it from this Ship's Management Team (SMT).

18. Approximately a week after Mr. Thompson received the threatening email from Mr. Wells, on December 25, 2018, Mr. Thompson arrived on SACAGAWEA and found that his assigned managerial stateroom/office since 2012 had been revoked. His keys to the door no longer worked and his nametag had been removed. Moreover, his personal belongings had been tossed in a garbage bag and thrown into a storage room. For years, Mr. Thompson maintained a stateroom near Mr. Sylvester's stateroom.

19. Like all other Port Engineers, Mr. Thompson had been assigned a stateroom to use during his visits on the vessel. Accordingly, Mr. Thompson was shocked to find that his stateroom had been suddenly revoked without any reason. Moreover, no other engineers of other races had their stateroom privileges revoked. As a result, Mr. Thompson was forced to change clothes in the mess room.

20. In February or March 2019, Mr. Thompson again requested a meeting with the

upper management team Mr. Leonard Bell, T-AKE Class Manager, MSC N7 Engineering Department Head Mr. Andy Busk, and Mr. John Massey to discuss the hostile work environment and discriminatory treatment he received from Mr. Wells. The meeting was held on April 8, 2019, and Mr. Thompson again reiterated his concerns with working with Mr. Wells and expressed that he had built a good reputation as a Port Engineer for MSC and did not want that reputation to be ruined. None of the managers present at the meeting advised Mr. Thompson that he would need to file a complaint with the EEO counselor regarding this claim. During that same meeting, Mr. Thompson asked Mr. Andy Busk about an overdue promotion (Quality Step Increase, "QSI") that he had been considered for in 2015 by Mr. Andy Busk himself when he was the T-AKE Class Manager. Mr. Andy Busk told Mr. Thompson that he would have to start from scratch in order to be considered for a QSI in the Engineering group since the rules had changed.

21. In May or June 2019, Mr. Thompson requested a meeting with Mr. Rick Albert, the outgoing N75 Life Cycle Engineering Manager, Mr. Ed Hulick, the new incoming N7 Life Cycle Engineering Manager, and Mr. Massey. The meeting occurred on August 22, 2019, and Mr. Thompson again expressed his concerns regarding the hostile work environment he was being subjected to, and Mr. Albert requested that Mr. Thompson provide him with the relevant evidence of this treatment. Mr. Thompson promptly sent Mr. Albert an email documenting the treatment he received. Again, none of the supervisors advised Mr. Thompson of his need to file a complaint with the EEO counselor.

22. Likewise, on August 29, 2019, Mr. Thompson was called into Port Chief Engineer Paul Snyder's office as a follow-up to the complaint made on August 22, 2019. At the end of the meeting Mr. Snyder and Port Chief Engineer West David Scarberry offered to visit the vessel to assess the situation with the Ships Management Team. Again, neither advised Mr. Thompson of

his need to file a complaint with the EEO counselor regarding the hostile work environment.

23. As a result of the continuous discriminatory and abusive treatment by Mr. Wells, on October 19, 2019, Mr. Thompson was forced to go to the emergency room of the local hospital due to overwhelming stress. His doctor informed him that his body was in a hypertensive crisis and he was diagnosed with high blood pressure caused by high levels of stress. Mr. Thompson is on permanent daily medication to treat this condition.

24. In addition to the threats, intimidation, and ridicule that Mr. Wells directed towards Mr. Thompson, Mr. Wells also attempted to shift blame to Mr. Thompson for issues with SACAGAWEA and to deliberately diminish his standing and perception within the Agency and to hamper his future career prospects.

25. On November 4, 2019, Mr. Thompson learned that the shipyard had contaminated the vessel's navigation bridge with blast grit debris used to remove paint from the deckhouse. The next morning, Mr. Thompson raised the issue of whether to secure the deckhouse ventilation system, which Mr. Wells declined to do. The debris subsequently spread to other areas of the ship, and Mr. Thompson asked Mr. Wells again on multiple occasions to secure the ventilation system, which he refused to do. In the end, the failure to do so resulted in a loss of funding for the ROH/DD project of almost half a million dollars.

26. More importantly, Mr. Thompson was subsequently subjected to increased scrutiny due to the delay in the Regular Overhaul/Dry Docking ("ROH/DD") completion caused by Mr. Wells' refusal to secure the ventilation system. On January 10, 2020, MSC Expeditionary Fast Transport Class Manager Mr. Jamie Shine visited the ship on the pretense of looking at equipment on SACAGAWEA, but when he arrived he instead interrogated Mr. Thompson regarding the ventilation system issue. He informed Mr. Thompson that Mr. Bell had directed him to question

Mr. Thompson.

27. In addition, on February 14, 2020, Mr. John San Souci sent an email to a wide distribution list stating "Regrettably, the SACAGAWEA completion date has gained the COMSC and 4 Star attention as it pertained to impact to follow-on PREPO mission. Had this leaned in another direction, it would not have faired well for anyone involved". Thus, this incident undoubtedly damaged the reputation of Mr. Thompson as the port engineer on a project which failed to meet the expectations of the Commanding Officer Military Sealift Command and four-star officers in the Navy.

28. Subsequently, Mr. Thompson noticed a pattern of unusual inquiries into the ROH/DD work. In particular, T-AKE/T-AOE Program Office ("PM6") attempted to blame Mr. Thompson for the delay in the completed of the ROH/DD and for the additional resources required for the lifeboat davit repairs. On February 22, 2020, Mr. San Souci -- who worked for, and reported to Mr. Leonard Bell -- visited the ship unexpectedly and began to question Mr. Thompson regarding the ventilation cleaning efforts and lifeboat davit repairs. It was clear that Mr. San Souci was directed by Mr. Leonard Bell to attempt to find evidence to blame Mr. Thompson for these problems and remove him as port engineer. Mr. John San Souci continued to question Mr. Thompson via email regarding the repair process and delays in an attempt to find fault.

29. Likewise, on March 11, 2020, at the monthly Port Engineers meeting, Mr. Leonard Bell and Mr. San Souci continued to question Mr. Thompson and blame him for the condition of the lifeboat davit arms, which were thirteen years old. Mr. Leonard Bell and Mr. John San Souci engaged in this conduct in furtherance of PM6's effort to build a case in order to remove Mr. Thompson from his position.

30. As a result of PM6 and Mr. Wells' deliberate efforts to blame Mr. Thompson for

9

issues on SACAGAWEA, Mr. Thompson has suffered damage to his reputation within the Agency and his future career prospects within the Agency.

31. Moreover, other non-African American employees, Anthony Leofsky, David Bowyer, and Paul Barkdoll, were never heavily scrutinized or blamed by the Agency for circumstances out of their control in the same way that Mr. Thompson was.

32. Furthermore, evidence in the record indicates that other crewmembers likewise observed that Mr. Wells treated African Americans with increased hostility and contempt. Mr. Thompson and other African American coworkers have testified to the EEO that Mr. Wells regularly treated them less favorably than Caucasian workers and treated them with contempt and hostility by subjecting them to increased scrutiny and using profane and abusive language towards them, in particular towards Mr. Thompson. Mr. Wells asserts that he has not acted with discriminatory animus or subjected any employee to abusive treatment. Other employees of the Agency have asserted, in essence, that Mr. Wells was abusive to all of his subordinates. Therefore, there is clearly a dispute of material fact here as to whether Mr. Wells engaged in abusive behavior towards Mr. Thompson and other African Americans based on their race.

33. Finally, other coworkers who observed these events on a daily basis have also testified to the EEO that Mr. Wells subjected Mr. Thompson to abusive treatment and a hostile work environment. Specifically, John Massey, Alfred Turner, Marlin Carpenter, and Shane Sterling. In this case, Mr. Thompson was subjected to a deliberate and consistent abusive work environment over the course of over two years. Mr. Thompson is seeking relief from the abusive treatment on numerous occasions by raising these issues with both his supervisors and the EEO department. Despite his pleas for assistance, the abusive treatment finally ended only when Mr. Wells was forced to leave the ship due to his health. By that time, the damage had been done both

to Mr. Thompson's career prospects and his personal wellbeing.

34. Mr. Thompson and another coworker, First Assistant Engineer Marlin Carpenter, have testified to the EEO that Mr. Wells treated African-Americans less favorably than Caucasian employees and subjected them to increased scrutiny and a hostile work environment by engaging in abusive behaviors such as regularly screaming and insulting them when they did not agree with him. Another coworker, Program Analyst Alfred Turner, has likewise testified to the EEO that PM6 leadership, including Mr. Wells, directed increased scrutiny towards minority Port Engineers, including Mr. Thompson. Thus, whether Mr. Wells did engage in this pattern of discriminatory treatment toward African Americans is material to the issue of whether Mr. Wells subjected Mr. Thompson to a hostile work environment based on his race.

35. Relatedly, there also exists a dispute of material fact with respect to whether PM6 and Mr. Wells attempted to shift blame for problems to Mr. Thompson in a deliberate attempt to damage Mr. Thompson's career prospects within the Agency. Mr. Carpenter has expressed that Mr. Wells subjected him to similar discriminatory treatment which culminated in his termination. Thus, whether Mr. Wells attempted to similarly damage Mr. Thompson's career due to his racial bias is another issue of material fact in dispute here.

36. In addition, there is an issue of material fact in dispute here of whether Mr. Thompson's stateroom was revoked due to a lack of availability. Indeed, Mr. Thompson has retained this stateroom for many years, and it was not until he filed a complaint regarding treatment from Mr. Wells that his stateroom was revoked only a week later. Further, the Agency's proffered reason that the stateroom was revoked due to a lack of availability is plainly pretextual because no other engineer had his or her stateroom revoked. Likewise, Mr. Sylvester's testimony to the EEO that he wasn't aware that Mr. Thompson wanted a statement is nonsensical because Mr.

Thompson's stateroom was located near Mr. Sylvester's, which he was aware of.

37. When the ship went on a 14-hour sea trial on February 24, 2020 on the completion of the ROH/DD maintenance period, Mr. Thompson was still barred from using managerial accommodations while other white managers and shipyard superintendents were.

38. Moreover, it is undisputed that Mr. Wells regularly instructed Mr. Thompson to engage in illegal conduct in violation of Title 10, and, when he refused to do so, he repeatedly threatened to call his "friends in high places" to have him terminated. Repeatedly ordering a subordinate to engage in illegal conduct and threatening to have the employee terminated for not executing the illegal conduct is quite plainly a hallmark of an abusive and hostile work environment.

39. In summation, Mr. Thompson has experienced pervasive hostile and discriminatory treatment based on his race. As Mr. Thompson and others have testified to the EEO that, Caucasian employees were not subjected to the same abusive and hostile treatment by Mr. Wells. Mr. Thompson filed an official complaint with the Agency's EEO 43 days after the last unfair treatment on February 24, 2020 during the sea trials.

40. Mr. Thompson promptly reported all instances of discrimination to his supervisors and met with them on several occasions to express his concerns regarding the treatment he received from Mr. Wells. In this case, there is no doubt that the Mr. Wells and the PM6 team's attempt to cast blame on Mr. Thompson for the spread of the ventilation contamination, delay in completion of the ROH/DD, and the extra cost to replace the boat davits has resulted in damage to Mr. Thompson's reputation and future within the Agency. Indeed, Mr. San Souci even informed Mr. Thompson and others that high-level management within the Agency was disappointed with the results and that he could have potentially been terminated due to these events. Thus, the attempt

by PM6 and Mr. Wells to blame Mr. Thompson for these results has caused him to suffer an adverse employment action.

41. Moreover, Mr. Thompson has also testified to the EEO that other non-African American employees in similar situations were never blamed for situations which were out of their control, but, due to racial bias, as he was in this case. In this case, there is substantial evidence of pretext, which, if resolved in plaintiff's favor, would support a jury finding that the defendant's inherent motivation was discriminatory in nature.

42. The Agency testified to the EEO that Mr. Thompson's stateroom was revoked due to a lack of availability which is false because no other Engineers of other races had their staterooms revoked. Likewise, Mr. Sylvester testified to the EEO that he was unaware that Mr. Thompson wanted a stateroom instead of the CPO Messroom. This is false because Mr. Sylvester had observed Mr. Thompson using the stateroom for multiple years prior to Chief Engineer Frank Wells reporting aboard SACAGAWEA for duty and he knew that my belongings had been placed in a trash bag and that a different manager had been assigned to that same stateroom/office.

43. The Agency continues has repeatedly and continually taken advantage of Mr. Thompson's experience as a Port Engineer and have used him to manage multiple major maintenance projects on a regular basis since reporting onboard in 2011 which were all successful.

44. The Agency has handed out promotions and QSIs regularly with the Admiral commending the Engineering Team during a Town Hall meeting in November of 2020 for a job well done and acknowledged during that meeting that the engineering team had earned a total of eight (8) promotions (QSIs) for the year 2020.

## V. CONCLUSION

45. Mr. Thompson is claiming a hostile work environment, unfair and disparate

treatment that has caused the following conditions:

 a. Emotional Pain

 b. Mental Anguish

 c. Anxiety

 d. Stress

 e. Injury to Professional Standing

 f. Injury to Character and Reputation

 g. Injury to feelings

 h. Loss of Self Esteem/Confidence

 i. Loss of Health

 j. Fear

 k. Embarrassment

 l. Shame

 m. Headaches

 n. Loss of Concentration

46.   The initial case filed failed to capture all the critical evidence and facts of the complaint, e.g., timely claims of disparate treatment, etc.

47.   Under Title VII, Complainant request compensation for damages, as a result.

Respectfully Submitted,

*/s/ Anthony Thompson*

Anthony Thompson
Plaintiff

15 SOMERSET LANE
HAMPTON, VA 23669
(757) 449-1279
Athomp6729.e aol.com

14